Good morning, I'm Anthony J. Marlowe and I represent the appellant Victor Fernandez. Your Honor, this case should never have been, well, it is our position that it was not initiated by a preponderance of the evidence under section 983. It should have never survived our summary judgment motion other than the innocent 53-16 failure to report. It should have never, it should have been dismissed after the plaintiff's case in chief after all the evidence and motion JMOL. When you look at the facts of this case, there was nothing but a significant amount of money, which this case was five years ago. I'm wondering today if somebody had a significant amount of money in their home, if anybody would even be suspicious about that. To where the situation is economically today. But there was actually, there was no evidence whatsoever of any drug connection with the money. Before we get into the facts, this was a case where the officer presented an application for a search warrant to a magistrate. For the safe. For the safe. Yes. And a warrant was issued? Yes. Warrant was issued, too. What's the standard of review for a magistrate determination of probable cause? The magistrate looked at what the officer said and concluded there was probable cause to issue a warrant to search the safe. Correct? What's our standard of review for looking at what was that decision? Reviewing the magistrate's message? Yes. Is it de novo? Is it abuse of discretion? Is it clear error? What's the standard? I believe it's de novo, Your Honor. And what's your best case to support that? Well, just, Your Honor, I want to answer your question. We never attacked the warrant to examine the safe in this case. That was never an issue made by me. I never ---- There are no search and seizure issues in the case? No, there are none, Your Honor. There are none. When I examined the affidavit and I concluded that it seemed to pass muster, so I never challenged that. You're not challenging the lack of connection, if any, between what the investigation found and what happened? And what happened regarding what, Your Honor, the money? The search of the safe, yes. Well, we're ---- Your Honor, we're contesting the seizure of the money from the safe and from the briefcase in the residence because it was not initiated under Section 983 by a preponderance of the evidence. Okay. Is it the basis of your case that there's simply insufficient evidence to support what the district court did? Yes. Isn't that the guts of your case? Well, yes. Summary judgment and then again after the plaintiff's case in chief, after closing of all the evidence in JMLL. Well, you know all of the facts in this case, the amount of money, the way it was bundled. Yes. The types of bills, the names on them, all that rest of that kind of stuff. The key to me seems to be in one respect what weight, if any, we place on the evidence that came from the dogs. Yes. Because that says drugs, so without that it's just a bunch of money to take your argument. It's just a whole bunch of money under suspicious circumstances, but it's really the dog evidence that points most distinctly in the direction of drugs, right? Well, that would be plaintiff's strongest argument. Okay. Well, then let's go to that for a second. Okay. I want to make sure I understand the record. It seems to me that you conceded that there was enough from the dogs to at least create a genuine issue of material fact. I did not. Well, the court says, and I'm looking at page 116 of the excerpt, at the hearing plaintiff conceded that the dispute over the nature of the canine alert is a genuine issue of material fact that defeats summary judgment. Yes. And I read the colloquy, too, between you and the judge. And you seem, all right, let's back up a bit. I can't find any place where you tried to have the dog evidence excluded under 402 and 403 as irrelevant. Am I right? You didn't try to exclude it. I tried to discount it as. But you did not try to exclude it. The way I learned criminal law is you're a defense attorney. You identify all the evidence. You say, okay, how can I get it excluded and knock it out? Right. And I couldn't find any place where you argued that this is simply irrelevant, it's not probative, or 403, it's prejudice exceeds its probative value. So you seem to say, and the district court said, you conceded that there was some weight that we ought to give to this evidence. Yeah. And the district court was wrong. As I wrote in my brief, Your Honor, I didn't say that, and the transcripts don't show that. Well, what did you say? I mean, you came awfully close to that. I read it. Well, I read it, too. And it's kind of the way the district court seemed to put words in my mouth, but that didn't happen, Your Honor. Let's see. The first thing you said, conceded, it had some probative value. No. I said he – I think the judge asked us, well, aren't we talking about the weight of evidence at trial? And I said, we may be. Well, you see, I mean, you didn't say this has to be excluded because it's irrelevant. No, but I did – but I did argue, Your Honor, that it was not a sophisticated dog alert. Again, that goes to the weight of the evidence, does it not? Well, if we're talking about summary judgment, Your Honor, you've got the categories that the court is looking at. He's looking at the amount of money. He's looking at the dog alert. He's looking at several things that are in the cases. And in this particular case, there was a significant amount of money, which the court said not by itself, but, you know, which the Ninth Circuit has said is evidence of probable causes, some evidence. The dog alert, if it's discounted and it's not a sophisticated alert, then this Court in U.S. v. 30-060 discounted throughout the case because the dog alert was not a sophisticated alert. In this case, it showed, and I argued to the court by the declaration of the dog, quote, and otherwise that this dog who is capable of detecting five odors is absolutely not capable of detecting the one odor that sophisticated dog alerts detect, and that's the byproduct of cocaine, which is methyl benzoate, which evaporates quickly. Well, the case that you just cited did not hold as a matter of law that non-sophisticated dog alerts are inadmissible. It discounted the dog alert. Well, in other words, it has some value, but it's not all that great value. So it's still admissible. It's admissible, yes, it is. Yeah, okay. Yes. Now, the other problem is this is a Santa Barbara case. San Luis Obispo County, I guess. Yeah, well, I mean, it's north of Los Angeles. And the other case, this case you're talking about in L.A., has this idea that 75% of the money is contaminated in L.A., but that never got into your case. Your declaration was somehow held inadmissible because you missed a time limit or something. Oh, no, that's incorrect, Your Honor. You have no evidence on the record, as far as I can tell, that money in wherever this is, whichever county this is, is contaminated the way it is in L.A. or Las Vegas. Yes, I have a declaration from Jay Williams. But that's the declaration that was eventually excluded, wasn't it? No, it wasn't. That was Jay Williams' testimony would have been excluded at trial because we didn't comply. Right. But that's the point. It never made it to trial. But I'm talking about summary judgment. Well, you're going to have a hard time convincing me that summary judgment is before us, given the fact that this has gone to trial. Well, yeah, that was my point. My point is, because you made some kind of a mistake, and I don't mean to point a finger at you, it never got into the trial. Jay Williams never testified at trial. It wasn't before the jury. It was excluded. Yeah. Well, yes, but, I mean, that evidence came in through the detectives. I mean, that money stick, that cocaine. Why didn't you move to exclude the testimony from the dog as completely unreliable, not relevant, not probative, and likely to confuse issues? Is there any reason? Well, because it appeared to me that all the cases that I read from this circuit have allowed the dog. So that's my point. The dog is allowable, and we give it some weight, as did the trial court and the jury. Well, you give it some weight. Okay. And the standard of review is to look at the evidence in the light most favorable to the government, which prevailed? Yes. That gives you a high hurdle to get over, doesn't it? Doesn't it? Well, Your Honor, I think in this case, again, you haven't let me address summary judgment in this case. You said, well, you know, because our circuit doesn't allow it when it's, you know, has won the trial. Right. But there are the exceptional cases. And in this, you know, the exceptions, qualified immunity is one. This isn't qualified immunity. No. No. Statute of limitations is one. This isn't statute of limitations. No, but what this is, is applying the wrong standard. The court applied the standard of competing evidence, which I don't know what that is, Your Honor. The standard that was required was a preponderance of the evidence. This court judge came from the State courts. He's a good man. I'm not in any way trying to criticize him. You told him over and over and over again it was preponderance of the evidence under Canada. Yeah. And when he wrote his brief there, his ruling, he stated that the plaintiff says one thing, the defendant says one thing. This competing evidence is an issue for trial. But he did not compete. That's a standard kind of a way that people talk when it comes to summary judgment motions. There's competing evidence enough to create a genuine issue of material fact is what that meant. And that's exactly. And that's your standard summary judgment motion. But in this particular case, under Section 983, the standard is preponderance of the evidence. He knew that. You said it to him many times. I don't know. He didn't allow me to understand that. Did you argue that in your papers? Yes. Before summary judgment? Did I? That's preponderance? Yeah. You see, this happens all the time. Lawyers try to get us to believe the trial judge didn't know what he or she was doing because the magic words weren't mouth. But if you look at the entire run up to the thing, it was preponderance, preponderance, preponderance. Well, you can speculate. When I read his ruling, Your Honor, I don't believe his ruling reflects that he had an understanding or his clerk, whoever wrote the ruling, that there was an understanding. But he talks all over the place about preponderance. Well, I know. He asked counsel what's the standard here, is it probable cause or preponderance of the evidence. Well, I have this question. Yes, Your Honor. If you lose on the summary judgment, are you willing to stand by what the jury did? No, Your Honor, I'm not. I believe the jury's verdict was a compromised verdict. Well, what part of it? Lots of jury verdicts are compromised verdicts. But I want to know what there is in the jury verdict that should be set aside and why. Well, the jury verdict is the, okay, we could start with the money that was allegedly connected to narcotics. Okay. I think that the amount that was... That was the one alerted by the dog. Yes. All right. Well, the dog isn't testifying. You know, I don't believe dogs can testify. Do you? No, but... But the handler says this dog is trained, and when the dog does this, it means that that dog has scented narcotics in the money. Yes. And that's based on training and has been said here. That has some probative value, doesn't it? Well, Your Honor, it didn't have much to the jury because the jury concluded that the money in the safe, $151,000, was not connected to narcotics activity, and that the money in the briefcase, which the dog also alerted to, was. So apparently the jury didn't give it much credit. Well, yeah, but I'm pointing that was up to the jury to decide. And I don't see that you have anything that you told me yet outside of your summary judgment, which is on very tenuous ground, that enables us to change the jury verdict. At trial... You got some benefit out of it, and you got some detriment out of it. Your Honor, at trial, the only evidence was the dog alert. There was... Bundles of cash with people's names on them. We can address that. And a bunch of cell phones in plastic bags. And there was a toy cell phone that belonged to the child also, Your Honor. Was there several cell phones wrapped in plastic? I don't know if they were wrapped in cell phones. I don't know if they were wrapped in plastic. There was a handful of cell phones that was found in the closet. I got as many in my closet. But there was also, in that group, there was also a cell phone that... You have as many cell phones in your closet? Well, actually, I keep them in my filing cabinet. I got... I thought they were in your closet. I got dozens of them, Your Honor. But the... Don't bundle your fees, you know, in $3,000 amounts with funny names on them. Oh, no. Well, the only... There was two notations. And, again, that was the money in the safe, which the jury found was not connected to narcotics. Okay? There was no names and the money in the briefcase, which the jury found was connected. You're down to about a minute. Do you want to save any time for rebuttal? Yeah. I just wanted to say that those two notations were... The jury didn't give any weight to them because they found that money was not connected to narcotics. I would like to reserve the balance of my time. Okay. Thank you. Good morning, Your Honors. Quorum? Greg Quorum, Special Assistant United States Attorney for the Government. What does the government... What does special mean? I am not employed by the U.S. Attorney's Office. I'm employed by an outside agency. They hired you for this case? No, Your Honor. You do forfeiture work for the U.S. Attorney's Office. I do only forfeiture work, Judge Trump. Correct. Okay. Go right ahead. Thank you. I think the Court has touched upon the central issues in this case, and that is, is there substantial evidence to support the jury findings in this matter? And the government submits that there was a long laundry list of things that the jury could have found in favor of the government. And we did, in fact, argue that this was a preponderance case, and our burden was merely to show that our version of the facts was more likely true than not. Apparently, the jury sided with the government in a large part of our case. What is there besides the dogs? Besides the dogs, there was an unusually large amount of money. This was almost a quarter of a million dollars in an individual's home who, by his own financial records, did not appear to have the financial wherewithal to generate that kind of money in savings. Do we know that from looking at the tax returns on the restaurants and everything else? Yes, we do. In fact, there was a number of years, Judge Trott, when he was generating a negative adjusted gross income. Yet, at the same time, he was purchasing vehicles, which were financed. He was purchasing his home, where he apparently put $35,000 to $40,000 down, and going to banks for loans to keep his business afloat. And one of the arguments I believe I made to the jury is that it just doesn't make sense. Maybe he was hiding income from the government. That could be true. However, there were other facts to suggest that this was all narcotics-related currency. Another factor that came before the jury was the curious manner in which this money was stored in the house. This home was unlocked. I'm sorry. This home was a what? Unlocked. This is the town of Atascadero, which is not suburban Los Angeles. But the claimant himself testified that his restaurant, which was a short distance from the home, had been robbed and burglarized. Yet, he unabashedly indicated that he always left his home unlocked. I don't understand what that means. Does that mean drugs? Well, I think it means stupid. I think it's a combination of both. But we think in the facts of this case, when you look at the individual who mysteriously appears at about the time law enforcement goes to search the home. I'll leave my house open. You can go in and grab the briefcase is what you're talking about. Correct. Mr. Lario shows up at about that time. The briefcase is conveniently tucked in a cupboard above the stove about 12 feet from the entrance door that was left unlocked. We argued to the jury and most of the law enforcement witnesses testified that this was a classic drug deal situation. Did he or any of his business associates testify that they took the receipts from the restaurants and bundled them like this and put names on them and all the rest as some sort of a standard business practice? No. There was no testimony in that fashion. So the names weren't employees that were owed $3,000 or $2,000 and $3,000 or $2,000? No, Your Honor. Not that I understand. Did he ever make any attempt to explain the way the money was bundled and the names on them and all the rest? He did. And his explanation was what? His suggestion was that some of the money was paid by his ex-wife's son, an individual by the name of Gerardo, and some of the money was also money that was from his father, David Fernandez.  But other than that, there were no notes on the money in the briefcase. There was absolutely no indication on the briefcase money who owned the money. All the notes and what have you existed with respect to the money in the safe. Did you ever develop any information on Larios? No, we didn't because he wasn't identified at scene. And he took off as soon as he found out that he was there. I believe so. I think he decided it would be best that he leave. What else? What other indicia are there of drug-related proceeds that you'd like us to look at? Well, you have a discussion in the record about a large number of $20 bills. And most of the officers who testified say that $20 bill denominations are denominations that are commonly associated with street narcotics sales. They're also commonly associated with kidnapping. That was my information many years ago. Okay. But I think what the importance of that was in this trial is that there was some suggestion that this money might have been skimmed from his restaurant. And the detectives and the officers who testified said, well, if you're skimming, you take the large bills from the restaurant. You tuck those away. You evade taxes or whatever. But the process of a narcotics transaction typically involves small denomination bills. You know, a lot of the restaurants I go to, and maybe it's suggested that they're dives, have these signs on the cash register that say, no bill over $20 accepted. And I don't know what your ATMs are like here in California, but back home in Arizona, you put your card in, you get nothing but 20s. All right. I don't think there was any evidence in the record to suggest that Mr. Fernandez's record had such a sign. Can I ask this question? Yes. There are $87,000 that's involved with the drug-related money. Was that, if I understand right, that money's all in cupboards and not in the safe? Tell me about that, where it was. The way I viewed the evidence, and quite frankly, as the trial prosecutor in this case, I kind of kicked myself in reading the transcripts because there was two obvious questions I didn't ask of my witnesses. One, what was the total amount of currency found within the briefcase? And two, what was the total amount of currency found within the safe? Both of those questions were not asked specifically, although my witnesses did indicate that there was $151,000 found in the safe. We believed that the briefcase money, Your Honor, was the money that was principally involved in a narcotics transaction. How much was that? That was $74,850. Well, where did the other 11,000 or so come from? 87,000 was the drug money. Where did the rest come from? Well, Your Honor, that was the money that was involved in the currency smuggling violations. There was $57,000 carried by the claimant's sister. Oh, I'm sorry. $70,850. Correct. And that was in the briefcase? Yes. So that's all of it. Correct. Well, actually, there was $74,850 in the briefcase. Okay. And so the money in the cupboards, that was not drug-tainted, according to the jury. No, the jury did, in fact, find that that money was subject to forfeiture because it was drug-related currency. It was safe money that they seemed to have issues about the narcotics nexus. Now you've confused me a little bit. I thought the jury found $70,850 was attributable to drug trafficking. That's correct. And that $87,000 was attributable to currency or bulk cash violations. Absolutely. For a total of $157,850. Correct. And then the judge reduced that $157,850 to $120,850. That's correct. He reduced the currency bulk cash by about $35,000. By $30,000. Yeah. Yes, Your Honor. That's what he's asking about. So how much was in the safe, or do we know that? $151,000. $151,000, exactly. Now, Your Honor's asked about the dogs in this case, and I think the dogs were an important factor that the jury considered in this case. There was clearly no evidence before this jury of a contaminated currency theory. In fact, defense attempted to use the same expert used in the case of 30,060, Jay Williams. His testimony at trial was excluded because he didn't have any of the underlying data to support his opinions. We made expert discovery requests, and he basically folded and said, I don't have any of the supporting data for my opinions anymore. The reason doesn't matter. This evidence wasn't before the jury. Correct. Correct. It was not before the jury. At the same time, I believe the evidence showed that Deputy Barber's dog, Jake, was properly trained. And I think he was the kind of dog that we could call a sophisticated canine. And I have to check it when I read that terminology, because Jake was just a dog. These are just dogs. It's not as if you can train a canine to raise one paw for cocaine, another for heroin, wag the tail for opium. But he did, in fact, testify that Jake is proofed off of regular currency and will not alert to currency in general circulation. In fact, he indicated that Jake had been used, had been deployed in 25 currency sniffs, and out of those, he alerted to 11 and did not alert to 14. Some of the non-alerts involved as much as $30,000. So I think the evidence supported the notion that Jake did, in fact, have a dog that just sniffs currency on the street and alerts. He did, in fact, alert to the fact that this particular money had been closely associated with narcotics trafficking. Because of that, I think the jury's, as the court has indicated, I think the jury's verdicts in this case should stand. And I think the government believes that, you know, a just verdict was reached. It's not as if we stand here saying we won everything. The jury did, in fact, return money to the claimant. And the court ultimately ended up reducing some of our forfeiture on the basis of the Eighth Amendment. And I think a just result has occurred. The sister admits that she knew about the reporting requirements, but he says he did  not. What is there to sustain the belief that he did? Because it's necessary. Correct. To support the jury's verdict. Well, to support the 5332 allegation, it's necessary. Right. You have to have knowledge of the currency reporting requirements and basically a full cash smuggling offense. For the 5316 violation, all you have to have is transportation of over $10,000 across U.S. borders. But you have to tag him out on knowledge at some point, don't you? Correct. And what is there to show that he knew? Well, he denied it. Right. And we cross-examined him on that subject. And my only argument in that respect is that the jury didn't believe him. The jury didn't believe him. And it was because he had been across the border about 15 times in his life. Was he asked to point on whether he knew about the regulations? He was. Yes. And he said no. Correct. Okay. I think we understand your argument. Thank you for coming in today. Thank you. You have about half a minute or so on rebuttal. I think 40-some-odd seconds. I'll make it three. Okay. Your Honor, you asked my colleague what evidence there was, and he said there was a lot of money in the dog alert. That's all the evidence I heard say there was. Regarding those receipts, which, again, were in the safe and they were irrelevant to his testimony at trial, Gerardo is his son or his wife's son that paid back a loan to him, and David is his father, Pata David. He was taking the money on a trip to Mexico to his father. His Honor, your Honor asked about Mr. Larios. Was he ever pinned down? Actually, Mr. Larios testified at trial. He testified that he's a busboy from Mr. Fernandez. He testified that he went to the house to pick up some films, some videos. So he was questioned on the stand. Regarding, again, just the smuggling issue, your Honor, it is our position that there was actually no evidence of the intent to smuggle from either the sister or Mr. Fernandez. That's well briefed. Well, the money was under some bread? I'm sorry. The money was transported under bread in some kind of a container? Your Honor, the Mr. Fernandez's sister testified that there was money in the luggage that was in a clear bag, but it was sitting under some bread. And she knew about the reporting requirements and didn't report it? She testified that she knew about the reporting requirements, but she was never asked on the bus to report it. And she also testified, which was surprising to me, but counsel never inquired about it and I couldn't cross-examine my own witness. She also testified that she didn't know the money was in there. Did the man from Chicago, I think it was, with all the money, ever show up? No. The man from Chicago was the gentleman who bought the land in Mexico, gave Mr. Fernandez $15,000 down, which of $12,000 Mr. Fernandez brought back. But the other payments were made to Mr. Fernandez from Chicago. I've got one. Yes, Your Honor. Well, the judge reduced the smuggling from 78 to 50. What's the standard that we're supposed to follow on this? Is this just a discretionary matter? Well, Your Honor, under the Bajikajian case, the court lays out basically a formula which the district judge needs to consider. And the judge below did consider that formula and felt that he was compelled by the congressional intent and the criminal guidelines to take out what he thought would be the minimum of $50,000 or fine him the minimum of $50,000. And our position was that, you know, to use the guidelines. And the guidelines, again, are only advisory, so the judge considered. The government's not cross-appealing in this, are they? No, they're not. Okay. You're over your time. Thank you, Your Honor. Thank you. I apologize for going over my time. That's okay. Any other questions? I don't see any. Thank you, Your Honor. The case is submitted for decision. Thank both counsel. The next case on the argument calendar is the United States against Community Home and Healthcare Services, Inc. If counsel will come forward, please.
judges: Trott, Hawkins, Bright